UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CAMSOFT DATA SYSTEMS, INC.

VERSUS

SOUTHERN ELECTRONICS SUPPLY,
INC., ET AL.

CIVIL ACTION

NO. 09-1047-JJB

RULING

This matter is before the Court on motions to dismiss Plaintiff's antitrust and RICO claims filed by various Defendants in this matter as well as cross-motions for summary judgment on the issue of joint venture. In a prior ruling, the Court addressed numerous claims, dismissing some but not others. (Doc. 313). As the Court had allowed Plaintiff CamSoft Data Systems, Inc. ("CamSoft") to amend its Petition again on only its antitrust and RICO claims, the Court did not address those claims at that time. These new allegations are contained in the Third Amended Complaint ("TAC"). CamSoft filed omnibus oppositions in response to the antitrust (doc. 341) and RICO (doc. 342) claims. Defendants filed the their motions and replies individually as follows: Active Solutions, LLC, Brian Fitzpatrick, Henry J. Burkhardt, Ignace A. Perrin III, and Southern Electronics Supply, Inc. ("Southern") (collectively, the "Active-Southern Defendants") (docs. 324, 356); Motorola Solutions Inc. ("Motorola") (doc. 325, no reply); CIBER Inc. ("CIBER") (doc. 326, no reply); MMR Constructors, Inc. ("MMR") (docs. 327, 350); EarthLink, Inc. ("EarthLink") (docs. 328, 347); Donald Berryman and Bill Tolpegin (together with EarthLink, "EarthLink Defendants")

(docs. 329, 348); Dell Inc. and Dell Marketing, L.P. ("Dell") (docs. 330, 354); Billy Ridge (doc. 331, no reply); Heather Smith and Steve Reneker (doc. 332, no reply) (together with Dell, "Dell Defendants") and Mark Kurt (doc. 333, no reply), the former director of technology for the City of New Orleans. At the direction of the Court, the parties filed cross-motions for summary judgment on whether a joint venture existed between CamSoft and the Active-Southern Defendants. CamSoft filed several briefs on this subject (docs. 315, 337, 339, 340), as did Active-Southern and the associated individuals (docs. 319, 321, 338, 346, 349, 370). Nearly all other Defendants also filed motions (docs. 317, 320, 322) relating to the potential CamSoft/Active-Southern joint venture.

By this point, many judicial resources have been consumed trying to unravel the New Orleans crime camera project. There have been criminal convictions and civil verdicts handed down against former city employees and technology vendors—many of whom are named in this lawsuit. CamSoft's role in this is either that of a partner of the Active-Southern Defendants who has not had its day in court yet or that of a former subcontractor with limited recourse against the Defendants. What follows is the factual background as it relates to CamSoft. As the parties tell it, CamSoft won favorable press coverage for work it was doing on wi-fi networking in Baton Rouge in 2003. Southern's president, Mr. Fitzgerald, emailed CamSoft's president, Mr. MacDonald, to congratulate him. The two then had a telephone discussion wherein Fitzgerald told MacDonald about a pilot

program they were working on for the City of New Orleans ("the city") related to crime cameras. The two discussed ways they might be able to put their heads together—along with other technology vendors, including Active—to make the crime camera system work in New Orleans by incorporating CamSoft's networking abilities in with Southern's camera system. CamSoft was a licensed retailer for TROPOS, a networking hardware company. The alliance they formed will be discussed below, but nothing was reduced to writing. The pilot project was completed—with varying levels of success, depending on which party is telling the story—and the city put out a request for proposals ("RFP") for a large scale implementation of a wireless crime camera network. Southern won the July 19, 2004 contract ("the contract") and CamSoft participated in the implementation, although without a written agreement with Southern—the two sides had been trading subcontractor proposals without agreement. The terms of the contract called for Southern to supply crime cameras to the city on a per camera basis with certain minimum purchase requirements but no concrete commitments. At some point, Southern quietly replaced CamSoft with Dell and Ciber. Later Southern itself was replaced—again quietly—through the machinations of members of the Mayor's Office of Technology ("MOT"). This suit seeks damages against Active and Southern for their role in cutting CamSoft out of the work and also against the other defendants for their role in cutting Southern—and by extension CamSoft—out. As the existence, or lack thereof, of a joint venture could be critical to CamSoft's standing to bring these antitrust and

RICO claims, the Court will address the cross motions for summary judgment first.

Joint Venture

A motion for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). While multiple Defendants have filed motions on the joint venture issue, the Court will focus on CamSoft's and the Active-Southern Defendants' briefs, noting that there are no allegations of a joint venture existing between CamSoft and any of the other Defendants.

In Louisiana joint ventures are fiduciary in nature and are generally governed by partnership law. *Scheffler v. Adams and Reese, LLP*, 950 So.2d 641, 648 n. 2 (La. 2007). The Louisiana Civil Code defines partnership as "a juridical person, distinct from its partners, created by a contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit." La. Civ. Code Art. 2801. The Louisiana First Circuit developed a test in *Cajun Elec. Power Co-op Inc. v. McNamara* that incorporates these principals. 452 So. 2d 212, 215 (La. App. 1 Cir. 1984). The Seven elements of the *Cajun Electric* test are as follows:

(1) A contract between two or more persons;

(2) A juridical entity or person is established;

(3) Contribution by all parties of either efforts or resources;

(4) The contribution must be in determinate proportions;

(5) There must be joint effort;

(6) There must be a mutual risk vis-à-vis losses;

(7) There must be a sharing of profits.

The Court notes that this *Cajun Electric* test is the only one formulated after the 1980 revision to the Louisiana Civil Code. And while some Louisiana circuits use older tests, the Court finds that there is no substantial differences between those tests and the *Cajun Electric* test that would change the analysis in this case. The Active Southern Defendants claim CamSoft cannot prove the existence of any of these elements and that there is no joint venture as a result. (Doc. 369 at 19). The Court need not decide whether Southern is correct as to all the elements, as it finds there was no contract to enter a joint venture, the first element. The parties agree that there was a telephone conversation in June 2003 between Mr. MacDonald, CamSoft's president, and Mr. Fitzgerald, Southern's president. During this call, Fitzgerald was interested in a networking project

5

MacDonald was doing in Baton Rouge[1] and told MacDonald about the crime camera project the City of New Orleans was planning. The two discussed how those cameras might run on the network CamSoft was building in Baton Rouge. MacDonald testified in his deposition that during the call "at that time we both agreed to let's work together to see if we can come up with a solution to answer the thousand cameras using the networks that we were building." (Doc. 315-3 at 2). Nothing was reduced to writing, nor was it fleshed out for specific details. The parties ultimately worked together through the pilot project program, which featured TROPOS wireless antennas. The city subsequently put out a request for proposals ("RFP") for the overall camera project. The question before the Court is whether this conversation constitutes the formation of a contract that binds the parties through not only the pilot project but also the RFP process and ultimately the crime camera program, and beyond to Baton Rouge, and Jacksonville. The Court finds it does not.

While the phone conversation could be enough to form a binding oral agreement, the Court finds the lack of specificity and the subsequent actions of the parties indicate that, at most, the parties agreed to join together for the pilot program but not the subsequent crime camera program. This is borne out by the subsequent actions of the parties. Southern, which won the crime camera contract, and CamSoft began trading contract proposals. Both parties' proposals

---

[1] The Baton Rouge project was being performed by Verge, a wholly owned subsidiary of CamSoft. For the sake of clarity, the Court will not distinguish between Verge and CamSoft.

6

Case 3:09-cv-01047-JJB-SCR    Document 382    04/30/12    Page 6 of 13

referred to CamSoft as a subcontractor. And while the determination of the relationship is made based on the facts, not the representations of the parties, the Court wonders why CamSoft would have negotiated at all if it felt it was already in a joint venture relationship with Southern. The proper response to a contract proposal from Southern would seem to have been a statement to the effect of, "Hey, we're partners, remember our agreement?" Nowhere is such a sentiment expressed by CamSoft. The January 30, 2004 email clearly shows CamSoft felt it deserved better due to the work it had done and the value it presented—not because of a contractual relationship. In fact, nowhere in the email does he mention being a joint venture or a partner or anything other than a businessman making a pitch to other business people to use more of his services. The Court finds the depositions, emails, and other documents indicate that CamSoft, as a TROPOS retailer, participated in the pilot program with the hope that it would be involved in future projects relating to this area. All the parties participated in the pilot program in hopes that more work would come from it. The fact that there ultimately was more work—though the city contract—bears this out. CamSoft, however, was not pleased with its new role and complained to Southern. Had there been no RFP process and the scope of work been the same on the crime camera project as on the pilot program, CamSoft would have a stronger argument. However, this was not the case.

7

The cases CamSoft puts forth are inapposite in that they both involve parties who clearly agreed to form a joint venture and then fought later over the terms. See *Joyner v. Liprie,* 44,852 (La. App. 2 Cir. 1/29/10), 33 So. 3d 242; *Gonzales Man. & Ind. Mach. Works, Inc. v. Hoover*, 415 So.2d 359 (La. App. 1 Cir. 1982). In the case at bar, it is the contractual formation element is at issue. Had such a contract been formed, these cases would help with the other element so of joint venture.

As the Court finds there was no contract to enter a joint venture, the Court will not address the other elements of joint venture. This is not the say there was no enforceable relationship between CamSoft and the Active-Southern Defendants. Rather, the Court only finds it cannot be based on joint venture.

<u>Antitrust and RICO Standing</u>

Several Defendants allege CamSoft does not have standing to bring its anti-trust and RICO claims and request dismissal under Rule 12(b)(1). The Court will address standing as it relates to the Active and Southern Defendants and the non-Active and Southern Defendants separately.

First, as to the antitrust claims, in order to have standing, a plaintiff must show: (1) injury-in-fact, an injury to the plaintiff proximately caused by the defendant's conduct; (2) antitrust injury; and (3) and proper plaintiff status, which assures that other parties are not better situated to bring suit. *Doctor's Hospital*

of Jefferson, Inc. v. Southeast Medical Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir. 1997). The Court notes that this standing inquiry should not "become the tail wagging the dog in 'classical' antitrust cases [] by an allegedly excluded competitor." *Id.* at 306. "Another way to explain the standing inquiry is that is ensures the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors." *Id.* An antitrust injury is an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's act unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977). In assessing whether a party is the proper plaintiff to bring antitrust claims, a court may consider the following factors: 1) the nature of plaintiff's alleged injury; 2) the directness of the injury; 3) the speculative measure of the harm; 4) the risk of duplicative recovery; and 5) the complexity in apportioning damages. *Bell v. Dow Chemical Co.,* 847 F.2d 1179, 1183 (5th Cir. 1988), citing *Associated General Contractors v. Carpenters*, 459 U.S. 519, 535 n. 31 (1983).

As it relates to the non-Active-Southern Defendants, the Court finds CamSoft is not a proper plaintiff. In making this finding, the Court notes that all of the *Associated General* factors weigh against CamSoft. The injury alleged is interference with the July 19, 2004 contract between Southern and the city. And while this may well be the sort of injury that flows from the alleged antitrust activity, the Court finds the lack of contractual privity between CamSoft and the

9

Active-Southern Defendants renders it too speculative and indirect in nature. It is undisputed that CamSoft was not a signatory to the contract, which was signed by Southern on behalf of Active and Southern. As the Court has found there is not a joint venture between CamSoft and Active and Southern, CamSoft has no connection to the July 19, 2004 contract. Therefore, any injury it may have sustained through interference with the contract is too speculative in nature to provide standing for an antitrust suit. As for CamSoft's allegations of disruption of sales and marketing efforts the Court finds this at least as speculative and indirect as the contract claim. Further, the allowing CamSoft to proceed would open Defendants to the risk of duplicative recovery by every company that has conducted marketing in the relevant markets during that time frame. Finally, apportioning damages under the latter theory would be difficult if not impossible.

Because CamSoft is not a proper party, all federal and state antitrust claims against the non-Active-Southern Defendants are dismissed for lack of standing.

As to the antitrust claims against the Active-Southern Defendants, the Court agrees that CamSoft cannot show an antitrust injury caused by Active-Southern. (Doc. 324-1 at 4). The Court notes the case law from the Fifth Circuit that holds a "downstream firm merely substitutes one supplier for another, there is certainly injury-in-fact" but seldom antitrust injury to that supplier. *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 320 (5th Cir. 2009). Active-Southern

found a new supplier to provide camera equipment under its contract with the city.  Nothing about this injured competition in general.  To the extent Active-Southern were originally part of a conspiracy to circumvent public bid laws, it seems they themselves were cut out by their conspirators before Active-Southern committed any antitrust violations.  The Court finds CamSoft has not alleged an antitrust injury; therefore, it does not have standing to bring the federal and state claims against Active-Southern and they are dismissed.

Next, in order to have standing to bring a RICO claims, a person must "be injured in his business or property by reason of a violation of" 18 U.S.C. § 1962. 18 U.S.C. § 1964(c).  The Fifth Circuit requires a RICO plaintiff to show two elements, injury and causation.  *Price v. Pinnacle Brands, Inc.* 138 F.3d 602, 606 (5th Cir. 1998).  Speculative damages are not allowed, instead "concrete financial loss" in terms of money is necessary.  *Anderson v. Kutak, Rock and Campbell*, 51 F.3d 518, 523 (5th Cir. 1995).  Further, "lost opportunity by itself does not constitute an injury that confers RICO standing." *Id.*

Again, CamSoft alleges its injury is interference with the July 19, 2004 contract.  Because of the Court's ruling on joint venture, this is not a concrete injury, CamSoft cannot complain about a contract it was not a part of.  As for its lost opportunity claims relating to its good faith marketing efforts, the Court finds again that this is not a concrete injury.  The same is true for CamSoft's good faith marketing efforts.  Nowhere in the Complaint can the Court find an allegation that

CamSoft bid on and would have won a contract were it not for the alleged RICO activities of the Defendants. CamSoft alleges in its brief that it was one of "possibly three" Louisiana TROPOS resellers and that its good faith marketing efforts in Baton Rouge "went nowhere" due to alleged RICO activities and that it was denied the opportunity to bid in other markets. (Doc. 342). Even assuming these allegations are contained in the Complaint—CamSoft was not kind enough to direct the Court to them—the Court finds these are not the kind of concrete injury that is required to have RICO standing.

The same is true of the RICO claims against the Active-Southern Defendants, the injury is not concrete and therefore CamSoft has not satisfied the injury element of the standing analysis. The RICO claims against them are dismissed as well.

As CamSoft does not have standing to bring either antitrust or RICO claims, the Court will not discuss elements of the claims; these claims are dismissed as to all Defendants under Rule 12(b)(1).

For these reasons, Defendants' motiosn for summary judgment (doc. 317, 319, 320, 322) are GRANTED and CamSoft's motion (doc. 315) is DENIED. As the Court finds CamSoft does not have standing to bring antitrust and RICO claims against any of the Defendants, their motions to dismiss (docs. 324, 325, 326, 327, 328, 329, 330, 331, 332) are GRANTED under Rule 12(b)(1). As all of the federal claims have been dismissed, the Court will follow the "general rule"

and decline to exercise jurisdiction over the remaining state law claims. *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 601-02 (5th Cir. 2009). The parties are hereby put on notice that the Court intends to remand those claims to the state court in five (5) days. Any opposition (less than two pages) to this must be filed within three (3) days.

Signed in Baton Rouge, Louisiana, on April 30, 2012.

        **JUDGE JAMES J. BRADY**
        **UNITED STATES DISTRICT COURT**
        **MIDDLE DISTRICT OF LOUISIANA**